UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DR. DAMIAN MEDICI,

*Plaintiff*

v.

Civil Action No. 1:17-cv-00265-M-PAS

LIFESPAN CORPORATION,
RHODE ISLAND HOSPITAL, and
MICHAEL SUSIENKA,

*Defendants.*

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Lifespan Corporation ("Lifespan"), Rhode Island Hospital ("RIH") and

Michael Susienka ("Susienka") submit this Statement of Undisputed Material Facts In Support of

their Motion for Summary Judgment pursuant to F.R.C.P. 56 and L.R. 56.

**A.  The Parties**

1.      Plaintiff is a research scientist specializing in stem cell research.  Plaintiff earned

his Ph.D. from Harvard in 2008.  From 2008 to 2012, he was a postdoctoral fellow at Harvard,

working in the labs of several, more senior scientists.  (DM-000003-15 attached as Ex. 01.)

2.      Plaintiff was employed by RIH from 2012 through 2015 and also had an

appointment as an Associate Professor at Brown's medical school, the Warren Alpert School of

Brown University ("Brown"), during that time.  (Ex. 01; LIFESPAN-0001004 attached as Ex.

02.)

3.      Plaintiff's research has focused on processes by which "standard" cells transform

to cells with stem cell-like qualities.  This area of research is potentially significant because of

the ways in which stem cells can be used, including to cure diseases and other conditions.  Some

1

of Plaintiff's research focused on a particular process of this type of transformation known as endothelial-mesenchymal transition, or "EndMT."  In EndMT, endothelial cells — cells that line the interior surface of blood vessels — transform to mesenchymal cells — a form of stem cells. Plaintiff's EndMT research involved transitions induced by exposing endothelial cells to certain reagents under certain conditions.  (LIFESPAN-0004932-4936 attached as Ex. 03 at 4936.)

4.      Defendant Lifespan Corporation is the sole corporate member of defendant RIH, as well as the other hospitals in the Lifespan system, including Hasbro Children's Hospital and the Miriam Hospital.  (Affidavit of Kenneth Arnold, dated Apr. 8, 2016 [Dkt. No. 12-4].)

5.      RIH is a private, 719-bed, not-for-profit acute care hospital and academic medical center.  RIH is the largest hospital in Rhode Island, and is a nationally and internationally recognized research center.  (See https://www.rhodeislandhospital.org/about-rhode-island-hospital.)

6.      Defendant Susienka was a graduate student in biomedical engineering at Brown's medical school from 2011 until 2017, when he earned his Ph.D.  Susienka was a research assistant in Plaintiff's lab from approximately August 2012 until April 2014.  (Susienka Dep. Ex. 8 attached as Ex. 04.)

**B.  Plaintiff's Employment by Rhode Island Hospital**

7.      In July 2012, Plaintiff received an offer of employment from RIH as a Research Associate II in the Department of Orthopaedics.  Plaintiff's employment included an academic position at Brown, where he was appointed Assistant Professor.  (LIFESPAN-000792-793 attached as Ex. 05.)

8.      Plaintiff began his employment in the summer of 2012.  (Excerpts from Deposition of Damian Medici attached as Ex. 06, at 30:14-15.)  Plaintiff did not sign an employment agreement at that time.

2

9.      In January 2014, Plaintiff signed an Employment Agreement with RIH for the term January 1, 2014 through June 30, 2019 (the "Employment Agreement").  (DM-000879-890 attached as Ex. 07.)

10.      The Employment Agreement required that Plaintiff "conform strictly to the standards of the Department, Hospital and Brown, as applicable, in effect from time to time" and that he "abide by and adhere to the requirements and obligations of all of Lifespan's and Hospital's policies and procedures, in effect from time to time."  (*Id.* at 879.)

11.      The agreement provided that Plaintiff could be terminated immediately for cause in the event of "a material violation of this Agreement" or

> The Doctor having been found to have participated in professional misconduct or to have been found professionally incompetent by any governmental entity or professional organization having jurisdiction.

(*Id.* at 881.)

12.      The Employment Agreement also provided that Plaintiff could be terminated for cause if his academic appointment at Brown was terminated. (*Id.*)

**C.  Federal Regulation and Lifespan's Research Misconduct Policy**

13.      Institutions like Lifespan and RIH that receive funding from Public Health Service ("PHS") agencies, including the National Institutes of Health and the National Heart, Lung, and Blood Institute, must comply with federal regulations regarding research misconduct.

14.      The regulations, which appear at 42 C.F.R. Part 93 (the "Regulations"), are intended to insure "the health and safety of the public . . . the integrity of research and the conservation of public funds."  42 C.F.R. § 93.100.  The Regulations require that institutions respond to "each allegation of research misconduct for which the institution is responsible."  42 C.F.R. § 93.300(a).

15.     The Regulations require that institutions adopt written policies regarding the process for addressing allegations of research misconduct in cases where the research at issue is supported in whole or part by PHS funds.  42 C.F.R. § 93.300.

16.     The Regulations define research misconduct as "fabrication, falsification or plagiarism in proposing, performing or reviewing research, or in reporting research results."  42 C.F.R. § 93.103.

17.     Institutional policies must meet the requirements of the Regulations, but the Regulations "do not prohibit or otherwise limit how institutions handle allegations of misconduct that do not fall within this part's definition of research misconduct or that do not involve PHS support."  42 C.F.R. § 93. 102(d).

18.     The Lifespan Policy on Research Misconduct (the "Misconduct Policy") was adopted pursuant to these Regulations.  (LIFESPAN-0006952-6964 attached as Ex. 08.) The Misconduct Policy states that its purpose is "to provide an appropriate policy and related procedures regarding the investigation and reporting of possible Research Misconduct, as defined herein, and to comply with the current federal regulatory requirements applicable to research." (*Id.* at 6952.)

19.     The Misconduct Policy provides that it "will normally be followed when a Lifespan official receives an Allegation," but that "particular circumstances in an individual case may dictate variation from the normal procedure where it is determined to be in the best interests of research integrity, or as needed for the operation of Lifespan and/or of any relevant federal agency." (*Id.* at 6953.)

20.     Plaintiff testified that he was unaware of the particular policies that applied to him at the time he entered into his employment agreement.  (Ex.06 at 70:9-71:14.)

21.     The Misconduct Policy requires that individuals who suspect that research misconduct has occurred or may be occurring report it, in most cases to the Research Integrity Officer ("RIO").  (Ex. 08 at 6955.)

22.     Brown also has a policy on research misconduct.  (Ex. 06 at 72:9-14.)  Brown's policy is available at https://www.brown.edu/research/conducting-research-brown/research-compliance-irb-iacuc-coi-export-control/research-misconduct-policy.

23.     Brown, where Susienka was a student, requires that individuals associated with the institution "report observed, suspected or apparent research misconduct."  (*Id.*)

24.     The Regulations and the Misconduct Policy provide that when an allegation of research misconduct is received, the RIO must determine if the allegation purports to identify actions that constitute research misconduct and is "credible and specific enough so that potential evidence of Research Misconduct may be identified."  (Ex. 08 at 6958; 42 C.F.R. § 93.307(a).)

25.     If the RIO determines that the allegation meets these requirements, there is a two-stage process to be followed before a determination of research misconduct can be made.  The first stage is an "inquiry," which is conducted by an Inquiry Committee empaneled by the RIO. (Ex. 08 at 6958.)

26.     The Federal Regulations do not require the use of a committee to conduct the inquiry stage.  The inquiry may be handled by the RIO or any other individual with the relevant expertise.  93 C.F.R. § 93.306, § 307.

27.     The purpose of the inquiry is to determine whether an investigation — the second stage of the two-stage process — is warranted.  To make that determination, the Inquiry Committee makes a "preliminary evaluation of the evidence and testimony"; it does not "determine whether Research Misconduct definitely occurred."  (Ex. 08 at 6958-59.)

28.     The Misconduct Policy provides that the Inquiry Committee will normally interview the complainant, respondent and other key witnesses, and will locate and secure relevant data and documents if it is determined that such data and documents may be part of the case.  (*Id.* at 6959.)  Witness interviews are to be summarized, and the witnesses provided with an opportunity to correct those summaries.  (*Id.*)

29.     At the end of the inquiry, the Inquiry Committee prepares a written report that summarizes the evidence and its conclusions.  (*Id.*; 42 C.F.R. § 93.307(e).)

30.     If (i) there is a reasonable basis for concluding the allegation falls within the definition of research misconduct, and (ii) preliminary information and fact-finding indicates that the allegation "*may* have substance," the Inquiry Committee is to recommend that the matter proceed to the second stage of the research misconduct determination process — the "investigation" (Ex. 08 at 6959; 42 C.F.R. § 93.307(d).)

31.     The respondent is provided a copy of the report and ten days to comment on it.  (Ex. 08 at 6959; 42 C.F.R. § 93.307(f).)  Based on the comments received, "the Inquiry Committee may revise the report as appropriate."  (Ex. 08 at 6959.)

32.     The Inquiry Committee's report, along with any comments thereto, are provided to the Deciding Official ("DO"), who decides whether to adopt the Inquiry Committee's recommendation.  (*Id.* at 6960.)

33.     The DO for Lifespan is John Murphy, M.D., the Executive Vice President for Physician Affairs.  (Excerpts of Deposition of John Murphy, M.D. attached as Ex. 09 at 7:1-3, 11:2-4.)

34.     If the DO decides an investigation is warranted, both the Misconduct Policy and Regulations require that the institution notify ORI of the decision to proceed to investigation. (Ex. 08 at 6960; 93 C.F.R. § 93.309.)

35.     The RIO selects the members of the Investigation Committee, to whom the respondent may object.  (Ex. 08 at 6960.)

36.     The Investigation Committee and the respondent are provided with the written allegations to be investigated, although the Investigation Committee is required to pursue relevant issues and leads beyond the written allegations, including evidence of additional instances of possible research misconduct.  (Ex.08 at 6960; 42 C.F.R. § 93.310(c), (h).)

37.     As part of its review, the Investigation Committee takes custody of and reviews the evidence collected by the Inquiry Committee, as well as any additional evidence deemed relevant.  (Ex. 08 at 6960; 42 C.F.R. § 93.310(d).)

38.     Relevant witnesses are interviewed, with the interviews recorded or transcribed. (Ex. 08 at 6960; 42 C.F.R. § 93.310(g).)

39.     The Investigation Committee must issue a preliminary report that explains its process, the evidence considered and its conclusion as to each allegation.  (Ex. 08 at 6961; 42 C.F.R. § 93.312(a).)

40.     A finding of research misconduct requires that the conduct at issue constitute "a significant departure from accepted practices of the relevant research community," that the "misconduct be committed intentionally, knowingly, or recklessly," and that "the allegation be proven by a preponderance of the evidence."  (42 C.F.R. § 93.104.)

41.     The institution has the burden of proof with respect to any allegation and the respondent has the burden of proof with respect to any affirmative defenses, including the defense of honest error.  (42 C.F.R. § 93.106(b), (c).)

42.     The absence of or the respondent's failure to provide research records is evidence of misconduct where the respondent had the opportunity to maintain the records but did not do so.  (42 C.F.R. § 93.106(b).)

43.     The respondent is provided with a copy of the preliminary report and given thirty days to respond.  (Ex. 08 at 6961; 42 C.F.R. § 93.312(a).)  At this time, the respondent is also entitled to review the evidence relied upon by the Investigation Committee in reaching its conclusions.  (Ex. 08 at 6961; 42 C.F.R. § 93.312(a).)

44.     The Investigation Committee considers the respondent's comments, makes any appropriate modifications to its report, and issues a final report of its investigation.  (Ex. 08 at 6961.)

45.     Under the Misconduct Policy (but not the Regulations), the respondent is given an opportunity to respond to the final report as well.  (*Id.*)

46.     The final report of the Investigation Committee, along with the respondent's comments, are forwarded to the DO, who decides whether to accept the Committee's findings.  (*Id.* at 6962.)

47.     The DO's determination, along with the report and respondent's response, are sent to ORI.  (*Id.*)

48.     ORI has a series of options once it receives the result of an institutional investigation.  ORI may review the institution's findings and process, make its own finding of

research misconduct or propose administrative actions, among other things.  (42 C.F.R. § 93.400.)  ORI may decide to take no action at all.  (*Id.*)

49.     In most cases where an institution makes a finding of research misconduct and imposes some form of administrative action, ORI takes no additional actions.  (Expert Report of Sheila R. Garrity attached as Ex. 10 at 7.)

**D.  The Allegations of Research Misconduct**

50.     Susienka was hired by Plaintiff to work in his lab around August 2012, just after Plaintiff had started at RIH.  (Ex. 06 at 136:20-24.)

51.     Susienka spent the first few months setting up Plaintiff's lab — ordering equipment and materials and otherwise helping to prepare the lab for Plaintiff's research projects.  (Deposition of Michael Susienka attached as Ex. 11 at 27:1-8.)

52.     Susienka continued working in Plaintiff's lab over the next year, apparently performing well.  In September 2013, Plaintiff provided Susienka with a letter of recommendation in which he described Susienka as "highly qualified," "highly motivated" and "passionate about scientific research."  (LIFESPAN-0012280-81 attached as Ex. 12.)

53.     Plaintiff later described Susienka as "brilliant."  (LIFESPAN-0009064-70 attached as Ex. 13, at 9067.)

54.     In the summer of 2013, Susienka was preparing for his qualifying exam.  The qualifying exam is, in essence, the graduate student's dissertation proposal which the student presents to his or her dissertation committee.  (Ex. 11. at 29:9-14.)

55.     The qualifying exam typically includes a written research proposal and an oral presentation, accompanied by a PowerPoint presentation.  The subject of the graduate student's qualifying exam is usually related to the work of the professor in whose lab he or she is working, since the research for the dissertation is performed in that professor's lab.

56.     Plaintiff suggested that Susienka base his qualifying exam (and this his dissertation) on inducing EndMT by using chemical compounds known as triterpenoids. Plaintiff claimed that he had begun researching this topic while at Harvard and agreed to provide Susienka with data generated during that research to assist Susienka in preparing for his qualifying exam.  (Ex. 11 at 43:20-45:17.)

57.     The data Plaintiff provided included a number of microscopy images that, according to Plaintiff, reflected the results of experiments in which EndMT was induced using triterpenoids.  Susienka used these images in the qualifying exam that he submitted to his dissertation committee.  (*Id.*)

58.     Susienka's qualifying exam was entitled "Endothelial-mesenchymal transition for cartilage regeneration."  (LIFESPAN-0012637-72 attached as Ex. 14.)

59.     In August 2013, Susienka was preparing the PowerPoint that would accompany the oral presentation portion of his qualifying exam.  Susienka noticed that certain of the microscopy images that Plaintiff had provided appeared to be duplicates of images in a 2010 article authored by Plaintiff and published in *Nature Medicine*.  (Ex. 11 at 45:18-47: 13.)

60.     The images in the *Nature Medicine* article purportedly represented the results of experiments in which EndMT was induced by exposure to certain transforming growth factors, while the images provided by Plaintiff for inclusion in Susienka's qualifying exam purportedly represented the results of experiments in which EndMT was induced by exposure to triterpenoids.  (*Id*. at 46:8-17; 29:15-21.)

61.     At the time Susienka noted the duplicate images, Plaintiff was traveling overseas. Susienka sent Plaintiff an email in the hope that they could find a time to discuss what Susienka had discovered.  Plaintiff responded that he was unable to speak, and asked Susienka to email

him about what he (Susienka) had found.  Susienka emailed Plaintiff details regarding the

duplicate images, stating that he was "completely shocked/dumbfounded" by the discovery.

(LIFESPAN-0012241-43 attached as Ex. 15.)

62.     Plaintiff responded that same day.  He said that he would review the images and

that, if they were indeed duplicates, he would be "extremely pissed off at my former post doc for

sending those images."  He also told Susienka that they were "not going to publish these data"

and told Susienka, "don't tell anyone about this."  (*Id.*)

63.     Upon his return, Plaintiff apparently concluded that the images identified by

Susienka were duplicates because he provided new images for Susienka to use in his qualifying

exam.  (Ex. 11 at 66:22-67:15.)

64.     Susienka replaced the original images with the new ones provided by Plaintiff.

He passed his qualifying exam and continued working in Plaintiff's lab.  (*Id.* at 68:22-69:9.)

65.     In February/March 2014, a major scandal broke in the world of scientific

research.  The scandal involved articles published in *Nature*, one of the world's top science

journals and the parent journal of *Nature Medicine* — the journal in which Susienka had

discovered the images that were duplicates of images in his qualifying exam.  (*Id.* at 82:12-

83:18.)

66.     In January 2014, *Nature* had published two breakthrough articles positing that

ordinary cells could be transformed into stem cells.  Almost immediately, allegations emerged

that certain images in the article were duplicated from other sources and that other images were

manipulated.  The articles were retracted and one of the scientists at the heart of the research

committed suicide.  (*Id.*)  The scandal generated an intense amount of publicity, including a

lengthy article in *The New Yorker*. *See* D. Goodyear, The Stress Test: Rivalries, intrigue, and fraud in the world of stem-cell research, *The New Yorker*, Feb. 29, 2016.

67.     Having this scandal and its similarities to what he had experienced with the images in his qualifying exam at the back of his mind, Susienka began reviewing articles published by Plaintiff that also posited that non-stem cells could transform into stem cell-like cells under certain conditions.  (*Id.* at 82:16-22.)

68.     Susienka noticed that certain images in those articles appeared to be duplicates of images in other of Plaintiff's articles.  The duplicate images purported to represent the results of different experiments, with the necessary result that if the images were duplicates, at least one of them had to be incorrect.  Susienka identified six sets of images that he believed were likely duplicates.  (LIFESPAN-0010579-88 attached as Ex. 16.)

69.     On March 5, 2014, Susienka contacted the Brown ombudsman to discuss his findings.  (LIFESPAN-0010331-33 attached as Ex. 17.)  The ombudsman referred Susienka to Elizabeth Harrington, the Associate Dean for Graduate and Postdoctoral Studies, with whom Susienka met on March 11, 2014.  (*Id.*)

70.     Dean Harrington apparently concluded that the matter needed to be addressed by Lifespan, the parent of RIH, since RIH employed Plaintiff and housed his lab.

71.     On March 31, 2014, Susienka and Dean Harrington met with Dr. Peter Snyder, who was both Lifespan's Chief Research Officer and RIO.  (LIFESPAN-0015359-61 attached as Ex. 18.)  Susienka detailed his allegations regarding the duplicate images and provided image files illustrating the duplicates he had uncovered.  (*Id.*)

72.     Of the six sets of duplicate images, two involved images in a manuscript authored by Plaintiff and Dr. Logan Walsh (the "Walsh Manuscript").  (Ex. 16.)

73.     Plaintiff had submitted the Walsh Manuscript to a number of scientific journals over the previous year while employed by RIH and affiliated with Brown.  (LIFESPAN-002462-88 attached as Ex. 19; LIFESPAN-0002552-54 attached as Ex. 20; LIFESPAN-0001270-72 attached as Ex. 21.) Three sets of duplicate images involved articles that Plaintiff had published while he was a postdoctoral fellow at Harvard and one set involved an image that was duplicated two times — one within an article published while Medici was at Harvard and then again in the Walsh Manuscript.  (Ex. 16.)

74.     During the meeting with Snyder, Susienka also voiced concerns regarding Plaintiff's behavior and how he might react to the allegations.  Susienka claimed that Plaintiff had a large ego and was paranoid.  He claimed that Plaintiff had bragged about being in bar fights.  Susienka noted that Plaintiff had changed his name at some point in time.  Susienka stated that he was concerned that if Plaintiff learned that Susienka was the source of the allegations, he might stalk or physically accost him.  (Ex. 18.)

75.     Snyder immediately began assessing the allegations.  He requested additional information from Susienka and the identity of other individuals working in Plaintiff's lab.  (LIFESPAN-0010409 attached as Ex. 22.)

76.     While Snyder was collecting and reviewing that information, Susienka raised an additional allegation of potential misconduct.  On April 2, 2014, Susienka emailed Snyder that Plaintiff had been working in the lab to reproduce results from earlier, published work he had conducted and, in so doing, engaged in "blatant misrepresentation/mislabeling of cell types that are being grown in these flasks, which will drastically alter the results of his experiments." (LIFESPAN-0010412-14 attached as Ex. 23.)

77.     Snyder determined that Susienka's allegations were sufficiently credible and specific to merit an inquiry.

78.     In light of the allegations of on-going misconduct in the lab, Snyder consulted with Lifespan's Vice President of Human Resources, its General Counsel's office, and Murphy (the DO).  (LIFESPAN-004167-69 attached as Ex. 24.)

79.     A decision was made to suspend Plaintiff from his lab while the Inquiry Committee considered the allegations.  (LIFESPAN-0007857-58 attached as Ex. 25.)

80.     During the suspension, Plaintiff would not be permitted to access his lab, but could continue his other duties, including attending an overseas conference (which he was already scheduled to attend), overseeing student research projects and a lecture series, and drafting manuscripts.  (*Id.*)

81.     On April 9, 2014, Snyder met Plaintiff in the lab to inform him that Lifespan had received allegations of research misconduct involving him, would be conducting an inquiry into those allegations, and would be suspending Plaintiff in the interim.  (*Id.*)

**E.  The Inquiry**

82.     Snyder identified four experienced researchers to serve on the Inquiry Committee that would review the allegations.  Snyder asked Dr. Carl Saab, a neuroscience researcher at Lifespan, to chair the committee.  (LIFESPAN-0000560 attached as Ex. 26.)

83.     On April 8, 2014, Snyder met with the Inquiry Committee to deliver its charge. (LIFESPAN-0013007 attached as Ex. 27.)  Snyder summarized the allegations and other information provided by Susienka, and provided an overview of the process and the criteria warranting an investigation.  (*Id.*)

84.     Snyder also informed the Inquiry Committee members of the significance of their review, including the significant sanctions and reputational damage that could result if Plaintiff

14

were ultimately found to have committed research misconduct.  (*Id.*; Excerpts from Deposition of Peter J. Snyder, Ph.D. attached as Ex. 28 at 114:19-115:7; Excerpts from Deposition of Carl Saab, Ph.D. attached as Ex. 29 at 22:17-23:3.)

85.     Snyder instructed the Inquiry Committee that the process must be kept strictly confidential.  (Ex. 26.)

86.     Snyder collected and sequestered the documents and data that related to Plaintiff's research while at RIH.  He collected the laboratory notebooks of the individuals working in Plaintiff's lab and secured the computers in the lab, one of which was in the lab itself and one of which was in Plaintiff's office, which adjoined the lab.  (Ex. 28 at 173:8-20.)

87.     Snyder asked Susienka to provide any other documents or data in his possession that might be relevant to the investigation.  (Ex. 22.)

88.     Snyder also asked Plaintiff to collect any data in his possession that might be relevant as Plaintiff, more than anyone, would know where the data generated during his research was located.  (LIFESPAN-0004852-53 attached as Ex. 30.)

89.     Snyder contacted the Provost at Brown in order to insure that Plaintiff's Brown email account was preserved and to obtain any relevant email correspondence from that account. (LIFESPAN-0001116-8 attached as Ex. 31.)

90.     On April 11, 2014, Saab emailed Plaintiff, informing him of the composition of the Inquiry Committee, attaching the Misconduct Policy, and requesting that Plaintiff appear for an interview.  (LIFESPAN-0000278 attached as Ex. 32.)

91.     The Inquiry Committee conducted interviews of Susienka and other lab personnel on April 11, 17 and 18, 2014, and then interviewed Plaintiff on April 21, 2014.  (LIFESPAN-0000826-32 attached as Ex. 33.)

92.   The interviews were recorded using a digital recording device, but it was later determined that the quality of the recording was too poor to create a reasonably accurate transcript.  (Ex. 28 at 111:24-112:12.)

93.   Plaintiff was provided with the audio recording of his interview before the Inquiry Committee on August 11, 2014.  (LIFESPAN-0006461-63 attached as Ex. 34.)

94.   The Inquiry Committee found that the allegations met the criteria under which an investigation is warranted.  The Inquiry Committee noted that the allegations suggested "duplication of the same figures in multiple manuscripts, describing in each case a different data set."  (Ex. 33 at 827-828.)

95.   The Inquiry Committee noted that if the duplications were confirmed, they would "amount to fabrication/falsification of data in published manuscripts, as well as in copies of manuscripts submitted, during Dr. Medici's employment by this institution, for publication." (*Id.* at 828.)

96.   The Inquiry Committee finalized its report on or about April 28, 2014.  (*Id.*)

97.   The report was sent to Plaintiff on May 6, 2014, with a cover letter indicating that Plaintiff had ten days to respond.  Plaintiff submitted his response on May 16, 2014. (LIFESPAN-0016123-24 attached as Ex. 35.)

98.   By the time he submitted his response to the Inquiry Committee's Report, Plaintiff had engaged a criminal defense attorney to represent him in the proceeding. (LIFESPAN-0000612 attached as Ex. 36.)

99.   The Inquiry Committee members reviewed Plaintiff's response and determined that nothing in the response caused them to change their conclusion that the allegations of image

duplication "may have substance" such that an investigation was warranted.  (LIFESPAN-0000164-165 attached as Ex. 37; LIFESPAN-0000208 attached as Ex. 38.)

100.    Snyder submitted the Inquiry Committee's report, along with Plaintiff's response to Murphy (the DO).  (LIFESPAN-00004287 attached as Ex. 39.)

101.    Murphy adopted the Inquiry Committee's recommendation that the matter proceed to investigation.  (LIFESPAN-006969 attached as Ex. 40.)

102.    As required by the Regulations, Lifespan submitted the Inquiry Committee's report and Plaintiff's response to ORI on May 22, 2014.  (LIFESPAN-0000817-20 attached as Ex. 41.)

103.    ORI acknowledged receipt of the report on May 30, 2014.  (LIFESPAN-0012603-05 attached as Ex. 42)  ORI noted that certain of the articles at issue were published while Plaintiff was at Harvard, and advised Lifespan that it "may consider contacting the Research Integrity Officer (RIO) at [Harvard] if additional data is needed that is not at Lifespan."  (*Id.*)

104.    On June 13, 2014, Snyder contacted Harvard's RIO, Gretchen Brodnicki, to discuss the allegations.  Snyder requested of Harvard that "all potentially retrievable source records related to the published studies in question, as well as any source images (digital or film) be retrieved and sequestered for use in our investigation."  (LIFESPAN-0005080-82 attached as Ex. 43.)

**F.  The Investigation**

105.    Snyder selected four research scientists to serve on the Investigation Committee and notified Plaintiff of the selection on May 23, 2014.  (LIFESPAN-0007479 attached as Ex. 44.)

106.     On June 19, 2014, Plaintiff received notice of the specific allegations the Investigation Committee was charged with reviewing.  (LIFESPAN-0000552-55 attached as Ex. 45.)

107.     The allegations included two allegations regarding duplicate images in the Walsh Manuscript, an allegation relating to the alleged manipulation of an image in another manuscript submitted while Plaintiff was at RIH (the "Jorna Manuscript"), an allegation relating to the falsification or fabrication of data by manipulating live cell cultures in his lab at RIH, and four allegations regarding image duplications in articles published while Plaintiff was at Harvard. (*Id.*)

108.     The Investigation Committee convened on June 25, 2014.  (LIFESPAN-0013839 attached as Ex. 46.)

109.     Thereafter, the Investigation Committee commenced its review of the evidence. It evaluated the images at issue by, in the case of images in published articles, obtaining the images directly from the publishers' websites, and in the case of the unpublished manuscripts, by obtaining the manuscripts as submitted from the journals to which they had been submitted.  (Ex. 03 at 4942.)

110.     During this time, Lifespan and Harvard continued to discuss whether the allegations relating to the articles published while Plaintiff was employed by Harvard should be referred to Harvard for assessment under its own research misconduct policies.  On September 18, 2014, after consultation with ORI, Lifespan referred the four allegations relating solely to articles published while Plaintiff was at Harvard to Harvard.  Lifespan continued to review the remaining four allegations.  (LIFESPAN-0001301-02 attached as Ex. 47.)

111.     During the Inquiry stage, Plaintiff largely conceded that the images identified by Susienka were in fact duplicates and should not have been included in the later publications. However, he asserted that the inclusion of the duplicates was a clerical error and that he must have been given the incorrect images by someone in the lab and then included them accidentally in the articles.  (LIFESPAN-0000833-43 attached as Ex. 48.)

112.     In order to understand how such a clerical error could have occurred, the Investigation Committee asked Plaintiff, on numerous occasions, to produce the original data generated during the research discussed in the Walsh Manuscript.  Such requests were made on May 6, May 19, September 29 and November 12, 2014.  (LIFESPAN-0002388-89 attached as Ex. 49; LIFESPAN-0003061-62 attached as Ex. 50; LIFESPAN-0002730 attached as Ex. 51; LIFESPAN-0001799-1801 attached as Ex. 52.)

113.     Plaintiff was unable to produce any source data generated during the research discussed in the Walsh Manuscript and he was unable to identify any individual who might have provided him with the incorrect data that was included in the manuscript.  Plaintiff repeatedly claimed that all of the data generated for the Walsh Manuscript was at Harvard, although he did not state where, specifically, that data might be located.  (LIFESPAN-0001747-1798 attached as Ex. 53 at 1769, 1770, 1776.)

114.     On October 7, 2014, the Investigation Committee interviewed Plaintiff.  Plaintiff continued to maintain that the duplicate images in the Walsh Manuscript were the result of clerical error.  (*Id.* at 1772, 1777, 1778, 1781.)

115.     He offered the same explanation for how the images from his *Nature Medicine* article were provided to Susienka for purposes of Susienka's qualifying exam.  (*Id.* at 1761.) Plaintiff provided no explanation for how the error might have occurred, indicating that anyone

who worked in the lab at Harvard in which Plaintiff worked could have been at fault.  (*Id.* at 1772.)

116.     At his interview, and for the first time, Plaintiff came forward with images that he claimed were the "correct" images for the Walsh Manuscript, i.e. the images that should have been included in that manuscript instead of the duplicate images that were actually included.  (*Id.* at 1777-78.)

117.     Plaintiff did not provide the Investigation Committee with the image files themselves, only agreeing to show them the images on a laptop computer that he had brought with him to his interview.  (Ex. 03 at 4950.)

118.     Plaintiff later provided print outs of the images, but did not, until this litigation was filed, provide the image files themselves.

119.     Plaintiff was not able to explain how he came to have possession of these images or why it was that he only had possession of those images that were the correct versions of the duplicate images, and not *any other* data associated with the Walsh Manuscript.

120.     Plaintiff produced the image files associated with these images during this litigation, and testified that he had no other data associated with the research performed for the Walsh Manuscript.  (Ex. 06 at 264:11-265:14, 291:11-17.)  The image files show that they were created in August and September 2011.  (Medici Dep. Ex. 39 attached as Ex. 54.)

121.     During his interview, Plaintiff claimed that he had intended to continue the research on the Walsh Manuscript while at Lifespan.  (Ex. 53 at 1771.)

122.     The only data in Plaintiff's possession relating to the Walsh Manuscript are the images files corresponding to the images that were alleged to be duplicates.  Of the authors listed

on the Walsh Manuscript, Plaintiff performed the majority of the research.  (Excerpts of the

Deposition of Logan Walsh attached as Ex. 55 at 52:11-22.)

123.    Walsh, the only other author who performed research for the manuscript,

performed his research over a period of only six months in 2009.  (*Id.* at 23:24-24:4.)  Plaintiff

apparently continued the research until at least September 2011, perhaps far later.

124.    The Walsh Manuscript was not submitted for publication until March 2013.

(LIFESPAN-0002999-3001 attached as Ex. 56.)

125.    Plaintiff was listed as the manuscript's corresponding author, meaning he was the

author responsible for responding to any questions or requests from the journals or members of

the public if published.  (LIFESPAN-0010589-10610 attached as Ex. 57.)

126.    Such requests may include requests for data relating to the research at issue in the

publication.  (Ex. 06 at 304:5-305:4.)  Indeed, the journals to whom Plaintiff submitted the

Walsh Manuscript require that the corresponding author have access to the source data in order

to respond to journal questions.  (*Id.*)

127.    The Investigation Committee continued its work after Plaintiff's interview,

interviewing other members of Plaintiff's lab and gathering additional information relating to

Plaintiff's alleged manipulation of live cell cultures.  (Ex. 03 at 4941-42.)

128.    Plaintiff was provided supervised access to the evidence sequestered by the

Investigation Committee on December 8, 2014.  (LIFESPAN-0005041-47 attached as Ex. 58.)

129.    The Investigation Committee issued its preliminary report on May 20, 2015.

(LIFESPAN-0002191-2224 attached as Ex. 59.)

130.    The report concluded that there was sufficient evidence to find that Plaintiff had

engaged in research misconduct with respect to three of the four allegations reviewed by the

Investigation Committee. The report documented the evidence that had been reviewed and the reasons for the Investigation Committee's conclusions. (*Id.*)

131. The Investigation Committee found that, with respect to the two allegations involving image duplication, the preponderance of the evidence established that the images were, in fact, duplicates, and that Plaintiff had knowingly and intentionally used the images from, in the one case, his *Nature Medicine* article, and in the other case, his *Biochemical Journal* article, in the Walsh Manuscript. (*Id.* at 2206-07, 2209-11.)

132. Specifically, the Investigation Committee found that:

    a. the images at issue were in fact duplicates of one another (*id.* at 2207, 2209);

    b. the duplicated images in the Walsh Manuscript were false because they purported to represent the results of different experimental conditions than the experimental conditions described in the articles in which the images were originally published (*id.* at 2207, 2209);

    c. using an image generated during certain experimental conditions to represent entirely different experimental conditions is a significant departure from accepted practices (*id.* at 2207, 2211);

    d. the use of the duplicate images was intentional because

        i. while single instances of image duplication may occur by honest error, it is not credible, particularly in the absence of any attempt at explication, that the numerous instances of image duplication known to the Investigation Committee, including the two that it investigated, the four referred to Harvard, and the three relating to

22

                Susienka's qualifying exam, occurred accidentally (*id.* at 2207, 2211);

    ii.   The images at issue were cropped or otherwise manipulated, indicating that Plaintiff purposefully engaged with the images before including them in the Walsh Manuscript (*id.* at 2211);

    iii.  Plaintiff was not able to explain how he could have come to use the duplicated images in the identified instances of image duplication or how he came to find the allegedly "correct" images (*id.* at 2206-07, 2209); and

    iv.  Other than the particular image files that allegedly should have been used in place of the duplicates identified by the Investigation Committee,  Plaintiff apparently had no other images or data relating to the research at issue in the Walsh Manuscript or, at a minimum, refused to produce it.  (*Id.* at 2206.)

133.    While the Investigation Committee did not make any formal findings with respect to the allegations regarding duplicate images in articles published while Plaintiff was at Harvard, it did review those images for purposes of evaluating the credibility of Plaintiff's defense.  (*Id.* at 2200.)

134.    It is improbable that clerical error could explain the numerous instances of image duplication occurring in Plaintiff's articles.  (Ex. 28 at 88:5-19, 98:17-20; Excerpts from Deposition of Jonathan D. Kurtis, M.D., Ph.D. attached as Ex. 60 at 32:12-3:2; Ex. 29 at 40:10-16; Expert Report of Dr. Mike Rossner ("Rossner Report") attached as Ex. 61 at 5.)

135.   The Investigation Committee also concluded that the preponderance of the evidence established that Plaintiff had attempted to manipulate live cell cultures in his lab in the spring of 2014 in order to make it appear that his attempts to achieve EndMT were successful. (Ex. 59 at 2214-23.)

136.   The Committee's finding on that allegation was based on the following facts:

    a.   A lab assistant working in Plaintiff's lab was attempting to perform EndMT experiments in Plaintiff's lab and Plaintiff was providing the lab assistant with instructions as to how the experiments should be performed (*id.* at 2217);

    b.   A flask of mesenchymal cells appeared in the lab incubator shortly before the experiment bearing a label in the Plaintiff's handwriting that mislabeled the contents (*id.* at 2214-15);

    c.   Because she was suspicious of Plaintiff's actions (including why a vial of what appeared to her on observation under the microscope to be pure mesenchymal cells would be present during an experiment aimed at producing mesenchymal cells), the lab assistant withheld a crucial step in the experiment — the addition of the reagent that was necessary to induce EndMT (*id.* at 2217);

    d.   The lab assistant left the untreated endothelial cells in the lab on a Friday and was away from the lab on Saturday.  She returned on Sunday and, despite the fact that the reagent had never been added, found that all the wells in the plates that Plaintiff believed had been treated with the reagent contained a profusion of mesenchymal cells – as if the endothelial cells had undergone EndMT – without even exhibiting any of the cell death ordinarily associated with exposure to the particular reagent (*id.* at 2217-18); and

    e.   Plaintiff was in the lab during the "transformation" period of time (*id.* at 2214, 2217).

137.   The Investigation Committee concluded that the witnesses who testified that Plaintiff had engaged in such manipulation, taken together with contemporaneous notes created by those witnesses, were more credible than Plaintiff, and that Plaintiff's explanation for how the EndMT could have occurred in the absence of manipulation was implausible.  (*Id.* at 2222.)

138.    Unlike his lab assistants, Medici did not keep a notebook of the experiments he was performing in the lab in April 2014.  (Ex. 53 at 1762-63.)

139.    The April 2014 experiments were the first experiments Medici had performed in his lab since arriving at RIH.  (Ex. 06. at 332:24-333:7.)

140.    The Investigation Committee found that the evidence did not establish that Plaintiff had engaged in research misconduct with respect to one of the four allegations it reviewed — the allegation regarding manipulation of an image in the Jorna Manuscript.  (Ex. 59 at 2213-14.)

141.    The Committee found that, while there was evidence that the image in question had been altered, the extent to which the image had been manipulated did not necessarily render the image false or misleading, and that it was not clear that Plaintiff, as opposed to Jorna, had manipulated the image in question.  (*Id.*)

142.    Plaintiff was given 30 days to respond to the preliminary draft report, as provided for by the Misconduct Policy and the Regulations.  Plaintiff's response was received, reviewed, and discussed by the Investigation Committee.  (Ex. 60 at 130:11-15.)

143.     Revisions to the preliminary draft report were made to address certain of the points raised by Plaintiff, but the Investigation Committee affirmed its conclusions with respect to each of the allegations.  (*Id.* at 130:22-131:1.)

144.    The Investigation Committee issued its final report on August 18, 2015.  (Ex. 03)

145.    Plaintiff submitted his response to the final report on August 27, 2015.  (LIFESPAN-0007301-22 attached as Ex. 62.)

146.    The DO received the final report, as well as Plaintiff's responses to the Preliminary and Final Reports.  (Ex. 09 at 171:5-172:17.)

147.     The DO devoted twenty hours to reviewing the documents, after which he accepted the findings of the Investigation Committee.  (*Id.*; LIFESPAN-0000517 attached as Ex. 63.)

148.     On September 4, 2015, Lifespan submitted the final report and Plaintiff's responses to ORI.  (LIFESPAN-0006709-12 attached as Ex. 64.)

149.     ORI acknowledged receipt but has to date taken no action with respect to Lifespan's investigation or Plaintiff's alleged misconduct.  (LIFESPAN-0000556-57 attached as Ex. 65; LIFESPAN-0002583-86 attached as Ex. 66.)

150.     Plaintiff's employment by RIH was terminated on September 9, 2015.  (Ex. 02) Lifespan's notice of termination to Plaintiff stated that he was being terminated "in light of Lifespan Corporation's decision to uphold the findings of research misconduct articulated in the Final Report of the Lifespan Investigation Committee."  (*Id.*)

**G. The Harvard Investigation**

151.     On September 18, 2014, Lifespan officially referred allegations involving duplicate and/or manipulated images in articles published while Plaintiff was employed by Harvard to Harvard for investigation.  (Ex. 47).

152.     Harvard apparently believed that the allegations, combined with the inquiry performed by Lifespan, were sufficient to allow it to proceed directly to the investigation stage. (Sept. 22, 2014 letter from G. Brodnicki to D. Medici (produced by defendant without a Bates number) attached as Ex. 67.)

153.     After Plaintiff's counsel protested that procedure, Harvard opted to conduct its own inquiry into the allegations.  (Feb. 11, 2015 letter from C. Hale to G. Brodnicki (produced by defendant without a Bates number) attached as Ex. 68.)

154.     Harvard investigated the four instances of image duplication identified by Susienka and referred by Lifespan, and discovered and investigated an additional four instances of image duplication in Medici publications.  As part of its inquiry, Harvard interviewed a number of individuals with potentially relevant information, including the senior scientist in whose lab Plaintiff worked and Plaintiff himself.  (Oct. 26, 2016 Harvard Inquiry Report (produced by defendant without a Bates number) attached as Ex. 69.)

155.     With respect to the eight sets of allegedly duplicated images that were the subject of the Harvard inquiry, Plaintiff's defense was strikingly similar to the defense he asserted in the Lifespan investigation, namely that any duplications were caused by mere clerical error.  (*Id.* at 7, 8, 9, 12.)

156.     As he did in the course of the Lifespan investigation, Plaintiff produced the "correct" images that should have been used in place of the duplicate images appearing in his publications.  (*Id.* at 7, 8, 11.)  He also produced copies of pages from lab notebooks that he claimed were created contemporaneously and that, according to Plaintiff, showed that he had in fact achieved the results reflected in the "correct" images that he produced.  (*Id.* at 7.)

157.     When asked during the course of this litigation whether he had any other data, including lab notebooks or images, relating to those articles other than the images he claimed should have been used in place of the duplicate images, Plaintiff indicated that he had none.  (Ex. 06 at 267:6-23.)

158.     Harvard issued its inquiry report on October 26, 2016.  The Harvard Inquiry Panel found that the evidence was sufficient to warrant investigation with respect to all eight instances of alleged image duplication.  (Ex. 69.)

159.    The Inquiry Panel accepted the analysis of a forensic expert engaged by Harvard who found that, with respect to each of the eight alleged instances of image duplication, the images were in fact duplicates and did not "represent the output of two distinct experiments." (*Id.* at 6.)  The Inquiry Panel noted that the provenance of images and lab notebook pages produced by Plaintiff could not be verified and that "there is currently no additional evidence, beyond Dr. Plaintiff's testimony and his photocopied exhibits, to corroborate his assertion that these were honest errors."  (*Id.* at 13.)

160.    As of the date of this motion, Harvard has not issued the report of its Investigation Committee.

### H.  Plaintiff's Complaint and Procedural History

161.    Plaintiff filed the instant action in the United States District Court for the District of Massachusetts on February 17, 2016.  After motion practice, including a motion to dismiss or stay based on the First Circuit's decision in *Anversa v. Partners Healthcare System, Inc.*, 835 F.3d 167 (1st Cir. 2016), Plaintiff transferred this action to this Court on June 1, 2017.

162.    Plaintiff filed his Second Amended Complaint on June 12, 2017.  Plaintiff's Complaint alleges seven causes of action:  (i) breach of contract arising out of Lifespan's alleged breach of the Misconduct Policy: (ii) breach of contract arising out of Lifespan's termination of Plaintiff pursuant to the "for cause" provisions of the Employment Agreement; (iii) defamation; (iv) tortious interference with advantageous relations; (v) intentional infliction of emotional distress; (vi) violation of the Stored Communications Act; and (vii) Declaratory Judgment and Equitable Relief.

163.    Discovery commenced shortly after the filing of the Complaint, with the parties producing their written discovery responses and the bulk of their document productions in September and October 2017.

164.     Plaintiff was asked to produce any and all data relating to the articles and manuscripts at issue in the research misconduct investigation, including the Walsh Manuscript. Plaintiff produced only the same eight image files that were shown to Investigation Committee, confirming that these eight image files constituted the only data in his possession relating to the Walsh Manuscript.  (Ex. 06. at 267:6-23; Plaintiff's Responses to Defendants' Third Set of Interrogatories, dated June 18, 2018 attached as Ex. 70.)

165.     Depositions were conducted between February and May 2018.  Plaintiff took the depositions of Susienka, Snyder (the RIO), Saab (Chair of the Inquiry Committee, Dr. Jonathan Kurtis (Chair of the Investigation Committee), Dr. Olin Liang (a member of Plaintiff's lab), Dr. Anthony Reginato (a collaborator of Plaintiff at NIH) and Murphy (the DO), in his capacity as the corporate representative of Lifespan and RIH.  Defendants took the deposition of Plaintiff and Walsh.

**I.  Expert Witnesses**

166.     On May 14, 2018, Plaintiff designated Dr. Alan Price as an expert witness on the issues of the process undertaken by Lifespan in investigating the allegations against Plaintiff and whether that process conformed to the Lifespan Misconduct Policy and the Regulations.  (Expert Report of Alan Price, dated May 14, 2018 attached as Ex. 71.)  Price had been the Acting and then Associate Director of the Division of Investigative Oversight at ORI.

167.     Price was deposed on July 27, 2018.  At his deposition, Price testified that, in his opinion, Lifespan's investigation was inconsistent with the Misconduct Policy and the Regulations.  Price confirmed that he was not asked to opine on, and formed no opinion with respect to, whether the evidence before the Inquiry Committee was sufficient to warrant an investigation or whether the evidence before the Investigation Committee was sufficient to support the findings of research misconduct.  (Excerpts from the Deposition of Alan Price, Ph.D.

attached as Ex. 72 at 20:2-10, 21:18-22:18.)  As such, Price could not form an opinion as to

whether, had any of the alleged deviations from the Misconduct Policy or Regulations not

occurred, the outcome of either the Inquiry or the Investigation would have been any different.

168.    Defendants designated three expert witnesses.

169.    Sheila Garrity was designated as an expert on the process undertaken by Lifespan

to investigate the allegations of research misconduct.  Garrity is currently the RIO at The George

Washington University and previously served as RIO at Johns Hopkins University.  (Expert

Report of Sheila R. Garrity, dated July 13, 2018 attached as Ex. 10.)

170.    Garrity opined that the process undertaken by Lifespan conformed in all material

respects with the Misconduct Policy and the Regulations.  Garrity also opined that the evidence

before the Inquiry and Investigation Committees was more than sufficient to support both

Committees' conclusions.  Finally, Garrity opined that even if the alleged deviations from

Misconduct Policy and/or the Regulations occurred (without conceding in any way that they

did), the outcome of the inquiry and investigation processes would have been the same.

171.    Dr. Mike Rossner was designated to opine on whether the images at issue in the

Lifespan and Harvard investigations were duplicates, as found by the Lifespan Investigation

Committee and as concluded preliminarily by the Harvard Inquiry Panel.  (Expert Report of

Mike Rossner, Ph.D., dated July 13, 2018 attached as Ex. 61.)  Rossner is a forensic expert

specializing in image duplication and manipulation, and is the former Managing Editor of the

*Journal of Cell Biology* and Executive Director of The Rockefeller University Press, which

publishes a number of scientific journals.

172.    Rossner concluded that all of the sets of images investigated by Lifespan and

Harvard were duplicates.  His review of the articles and manuscripts at issue in those

investigations — a review that was not exhaustive given the scope of his engagement — revealed *another* 19 instances of image duplication across those articles and manuscripts.

173.     Rossner identified five instances in which Medici had used the same image in *three* separate publications and one instance in which Medici had used an image in *four* separate publications.  In each publication, the image was represented to be generated during a different experiment.

174.     Rossner identified three instances in which Medici manipulated images when duplicating them in subsequent publications, not including changes to the aspect ratios of the images.  (Ex. 61 at 46-48.).

175.     Rossner stated that in his experience he has not seen a manuscript with nine duplicate images (as he found in the case of the Walsh Manuscript) that was the result of inadvertent error.

176.     Dr. Gregory Curfman was designated to opine on the significance of the kind of research misconduct Plaintiff was found to have engaged in.  (Expert Report of Gregory D. Curfman, M.D., dated July 13, 2018 attached as Ex. 73.)  Curfman is the current Deputy Editor of *JAMA* and was the Executive Editor of the *New England Journal of Medicine* for 14 years.

177.     Curfman opined that, based on the two instances of image duplication in the Walsh Manuscript investigated by Lifespan — Curfman was not privy to Rossner's findings of an additional seven instances of duplicated images in the Walsh Manuscript — the images in the Walsh Manuscript did not accurately reflect the experimental results described therein, and that, had the Walsh Manuscript been published in a journal over which he was presiding,  he would "give serious consideration to demanding a retraction, or at least publication of an expression of

concern. Falsified research misleads the scientific community and must not be allowed to stand

uncorrected in the scientific literature."

178.    Plaintiff opted not to take the depositions of any of Defendants' experts.

Dated:     September 13, 2018

/s/ Rachel M. Wertheimer
Rachel M. Wertheimer, BBO # 625039
VERRILL DANA LLP
One Portland Square
P.O.  Box 586
Portland, Maine 04112-0586
(207) 774-4000
rwertheimer@verrilldana.com

and

Paul W. Shaw, BBO # 455500
VERRILL DANA, LLP
One Boston Place, Suite 1600
Boston, MA 02108
(617) 309-2600
pshaw@verrilldana.com

DEFENDANTS LIFESPAN
CORPORATION, RHODE ISLAND
HOSPITAL and MICHAEL SUSIENKA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF System, which I understand will send notification of the filing to all counsel of record.

/s/ Rachel M. Wertheimer

Rachel M. Wertheimer